(No. 45590.—

*In re* HILLARY H. HALLETT, Attorney, Respondent.

*Opinion filed Sept. 17, 1974.—Rehearing denied Nov. 27, 1974.*

GOLDENHERSH, J., took no part.

Dale F. Conde and Sidney Z. Karasik, of Pedderson, Menzimer, Conde, Stoner, Ferolie & Spelman, of Rockford, for respondent.

William T. Panichi, of Springfield, for *amicus curiae* Illinois State Bar Association.

MR. JUSTICE RYAN delivered the opinion of the court:

This is a disciplinary proceeding in which it is charged that the respondent, Hillary H. Hallett, an attorney, has been guilty of conduct and practices which tend to defeat the administration of justice and bring the courts and legal profession into disrepute. The complaint was filed by the Inquiry Division, Committee on Grievances of the Illinois State Bar Association and charges the respondent with approximately 30 instances of professional misconduct and practices. At the close of the complainant's evidence some of the charges were dismissed on motion of the complainant, and others were dismissed by the hearing panel on motion of the respondent. As to the remaining charges the hearing panel made certain findings of fact and conclusions of law in support of the charges and recommended that the respondent be suspended from the practice of law for two years and until further order of the court. The Board of Governors of the Illinois State Bar Association sitting as commissioners of the Supreme Court of Illinois under Rule 751 (50 Ill.2d R. 751) struck two additional charges contained in the complaint and amended the recommendation of the panel to a one-year suspension and until further order of the court. In all other respects the report and recommendation of the hearing panel were adopted as the report of the Board of Governors to this court.

The respondent had acquired a reputation as a successful and capable personal injury lawyer in the area of St. Clair and Madison counties in Illinois. During the course of his practice he had engaged the services of various laymen whom he designated as investigators. The hearing panel specifically found that there was no fee splitting between the respondent and any individual he had engaged in this capacity. One of the investigators whom the respondent had discharged became involved in some difficulties and went to the State's Attorney's office in

Madison County and stated that he had been a "chaser" for the respondent. He later reported to the Illinois State Bar Association all of the alleged illegal activities he had performed for the respondent. This investigator was later criminally charged with and convicted of selling a stolen typewriter. During the course of his trial another of the respondent's ex-investigators testified that Hallett had approved payment of $1000 to have the other investigator killed before he testified before the bar association concerning Hallett's activities. However, the alleged murder contract was not consummated. This testimony provoked a substantial amount of publicity in the area. As the result of this publicity rumors became quite prevalent that disbarment of the respondent was imminent.

To counteract these rumors and to assuage the concern of his clients respondent prepared a document which he called "Holiday Wishes and a Report to You on Rumors and Charges." The document was printed on the letterhead of the respondent's office and the introduction read "Dear Friends and Clients:". Respondent contends that it was intended that this letter go only to those clients who had active files pending in his office at the time of the mailing. The letter refers to rumors and charges and it assures the clients that regardless of respondent's death or disablement arrangements have been made for the handling of their cases by his associates. The letter refers to his previous successes; details his trouble with his dissatisfied investigators and recites his firm stance against threatened blackmail by the investigators; recites the name-calling and threats he has endured in the past; states how he has resisted tempting offers and invites his clients to call him as to any question they may have on these rumors and charges.

The respondent had also prepared a document which he called "Curriculum Vitae" which he had used in substantially its present form since 1965. The document recites the respondent's primary, secondary, undergraduate

and law school education and his activities and honors during those years. It refers to his practice experience in St. Louis, with a law firm in Alton and with his present firm. It lists his employment history before admission to the bar. It refers to his family and his community activities, lists certain individuals as references and discusses his work in professional organizations. The document lists 18 personal injury cases, giving the nature of the claim, the difficulties it was necessary for the respondent to overcome in order to prevail, the offer that had been made and the ultimate settlement or verdict figure in each case. It also refers to a murder case which the respondent had defended. Attached to the "Curriculum Vitae" are copies of several newspaper articles concerning sizeable verdicts that have been rendered in favor of clients whom the respondent has represented. Also attached is a copy of "Outstanding Plaintiff's Attorneys" published by Jury Verdict Research, Inc. It was stipulated that these documents had been used by the respondent in support of "Plaintiff's Trial Counsel Position Memorandum," which the respondent customarily prepared and submitted to the insurance carriers for defendants for consideration in discussing settlement of personal injury cases.

A third document the use of which is in question in this case is entitled "How Our Offices Handle Your Injury Claim." This document of eight pages including the transmittal letter sets forth in the index the following subjects which are discussed therein: (1) What is the purpose of this memorandum? (2) How are questions answered by my lawyer? (3) Are my files and calls confidential? (4) How do my lawyers investigate my case? (5) How does the company investigate my case? (6) Can and do the facts change in my case? (7) What are medical developments? (8) What is my claim worth? (9) How and when am I told of offers to settle my claim? (10) What is a lawsuit? (11) When is my lawsuit tried? (12) What are: interrogatories? depositions? trial preparations? (13) Are

most cases settled without a trial? (14) What is a jury trial? (15) Collateral source rule? (16) Some common and dangerous problems: (a) I don't need a lawyer, (b) They will pay me fairly, (c) The insurance companies are going broke. (17) Change of address, employment, *etc.* (18) Office appointments and telephone calls. This type of memorandum has been used by the respondent and his associates for the information of his clients since 1965.

The charges against the respondent which remain involve the use of these documents and the conduct of the respondent in his handling of three cases: the Edward Carter case, the Sylvia Hulliung case and the Irene Richardson case.

As to the general use of the "Holiday Wishes" letter, in view of the extensive publicity that had been given to the many unfounded charges which the respondent's ex-investigators had made and in view of the prevalent rumors as to the imminent disbarment of the respondent, it is only reasonable to expect that he would take some steps to set the record straight. The conclusion of the hearing panel approved by the Board of Governors implies that such an attempt is appropriate only if the clients had questioned the integrity of the respondent or knew of the rumors being circulated about him. We feel that the record establishes that the rumors and publicity were so widespread as to justify the mailing of a general explanation of the situation to all of his active clients. This is particularly true since the respondent, without success, attempted to procure publication in the newspapers of his version of the charges. We do feel however that in attempting to advise his clients the respondent has overreacted, and we are of the opinion that the contents of the letter are unnecessarily self-laudatory. Also, as we shall note later, this letter was sent to Mrs. Hulliung, who was not and had never been a client of respondent.

The complaint charges the respondent with having wrongfully "chased and solicited respondent's representa-

tion" of Edward Carter and Darlene Carter in their claim against Open Door Baptist Church arising from an automobile accident. The complaint further charges that the respondent, notwithstanding the directions of Edward Carter and Darlene Carter, wrongfully refused to withdraw as their attorney. The complaint charges that in an effort to induce the Carters to continue to employ him as their attorney, the respondent wrongfully sent the Carters an undignified and disreputable letter. The solicitation charges were dismissed by the hearing panel at the close of complainant's evidence. Also the hearing panel dismissed that part of the complaint which charged the respondent with refusing to withdraw as attorney for the Carters. The remaining charge as to the Carter case involves the content of the letter which the respondent wrote to the Carters after having received their letter asking him to withdraw as their attorney. Another attorney had been recommended to Edward Carter and he in fact discussed his case with this attorney. The respondent suspected that another attorney was trying to steal his client and, although not mentioning the attorney by name, in his letter to Carter he spoke derogatorily of the other attorney's experience. Here again, the prevailing climate and circumstances justified a proper factual response. We feel that the respondent made some unnecessary comments concerning the other attorney. However, we do not feel that the contents of the respondent's letter were such as to warrant consideration in this disciplinary proceeding.

Sylvia Hulliung was driving an automobile when it was involved in an accident with an uninsured vehicle. The facts indicate that she was negligent. Her sister, Rose Webster, was riding with her. Both ladies were injured and were taken to the same hospital but were put in separate rooms. The respondent was Mr. and Mrs. Webster's attorney and Webster called the respondent and asked him to represent them. He explained to the respondent that his sister-in-law, Mrs. Hulliung, was also involved in the

accident and had been injured. The respondent sent Randy Seeger, an investigator, to talk to Mrs. Webster. She in turn gave Seeger a note introducing him to her sister. During his discussion with Mr. and Mrs. Hulliung, Seeger gave them a copy of "Curriculum Vitae" and the newspaper clippings and the document entitled "How Our Offices Handle Your Injury Claim." He also persuaded them to sign a release for medical information. There is also testimony by an attorney, who was visiting his mother in the same room, that Seeger attempted to convince the Hulliungs that they should be represented by the respondent. The evidence shows that Seeger violated an express instruction from respondent by giving the Hulliungs copies of the "Curriculum Vitae" and "How Our Offices Handle Your Injury Claim." The evidence also shows that at a later date a copy of the letter "Holiday Wishes," which was mailed only to clients with active files in respondent's office, was sent to Mrs. Hulliung.

Irene Richardson lived in Paducah, Kentucky. Her husband had been employed by a river-barge line and was killed while so employed. Mrs. Richardson was advised by a representative of her husband's union to contact a firm of attorneys in St. Louis to represent her. She phoned these attorneys and they in turn sent an investigator (Seeger) to Paducah to procure her signature on a contract of employment. She signed the contract authorizing this firm to represent her. The contract did not mention the respondent's name, but the St. Louis firm requested him to handle the case for them. A few days later Mrs. Richardson contacted Mr. Schultzman, an attorney in Paducah, and signed a contract for him to represent her in her claim arising out of the death of her husband. There is evidence in the record which indicates that during this period Mrs. Richardson was on sedatives and she claims that she was not aware that she had engaged the St. Louis firm to prosecute her claim arising out of her husband's death.

Respondent's investigator Seeger testified that Mrs. Richardson contacted the respondent's office and said she did not want the respondent to represent her. At the respondent's direction the investigator then wrote Mrs. Richardson a letter dated October 11, 1969. In this letter he reminded her that her husband had been a good union man and she knows that he would want her to be represented by good union attorneys. He stated that he had never heard of Schultzman, the attorney she had mentioned, but had checked on him and found that he represented both insurance companies and boat companies and stated "this of course is not good for you." Seeger testified that the respondent pretty well dictated what he should write in the letter. He enclosed a copy of "Curriculum Vitae" with the letter.

In another letter dated October 11, 1969, the respondent advised Schultzman of the contract the St. Louis attorneys had with Mrs. Richardson and stated that a suit was then on file in the circuit court of Madison County, Illinois, where Mrs. Richardson's interests would be better served because it was a reasonably high verdict area as compared with McCracken County, Kentucky. The complaint was actually filed in the circuit court of Madison County on October 14, 1969.

On October 11, 1969, the respondent also wrote Robert Stith, claims manager for American Commercial Barge Line, and enclosed in the letter a copy of the complaint and informed him: "We anticipate that you will be hearing from other lawyers on this matter, who we are working out, we trust, satisfactory arrangement with, down in the Paducah, Kentucky area."

Also on October 11, 1969, the respondent executed an investigation assignment directing Seeger to "go ahead and meet Bill Graves [a Paducah attorney] tonight and you and Bill go out to Mrs. Richardson's home and try to figure out what on earth is going on." On the back of the assignment was typed "stress with Bill that *** I know

Herbert Schultzman's firm represents Home Insurance Company and this case should never be filed in Kentucky or anywhere except East St. Louis or Chicago."

Pursuant to the investigation assignment Seeger went to Paducah, Kentucky, and he and Bill Graves, the Paducah attorney, went to Mrs. Richardson's home about 10 p.m. on October 11, 1969, to discuss with her the reason for her change of mind concerning attorneys. Graves told her that Schultzman was not a river attorney and didn't know anything about river cases. He told her that she couldn't have two attorneys at the same time. She replied that she wasn't going to have two attorneys because she was getting rid of the St. Louis attorneys and was going to have Schultzman represent her. Some unpleasant words were exchanged between the men and Mrs. Richardson's sister who was present.

On October 15, 1969, Mrs. Richardson sent a letter to the respondent informing him that she had engaged her own counsel and did not wish for him to represent her. With this letter she enclosed a copy of a letter she had sent to the chief judge of the circuit court of Madison County in which she stated she had received a copy of the complaint which sought damages for her husband's death. She stated that she did not know the attorneys who had signed the complaint and had not authorized their employment. She stated that she had engaged the services of her own attorney in Paducah and requested that the chief judge advise her as to what steps were necessary to have the complaint which was filed in Madison County dismissed. Schultzman later retained counsel in Illinois who secured the dismissal of the complaint without resistance from the respondent.

From the contents of the letters dated October 11, 1969, the investigation assignment of the same date, Seeger's testimony and the testimony concerning the visit of Seeger and Graves to Mrs. Richardson's home the night of October 11, it is clear that the respondent was well

aware of Mrs. Richardson's desire to be represented by Schultzman and not by the respondent and the St. Louis attorneys before the complaint was filed by the respondent in the circuit court of Madison County, Illinois.

Considering now the "Curriculum Vitae" and the attached news clippings, there is testimony that the use of similar information is suitable for submission to insurance carriers in personal injury cases so that the claims agent of these companies will know the caliber of counsel who is representing the plaintiff. However, we agree with the findings of the commissioners that "Curriculum Vitae" and the attached news clippings are unnecessarily self-laudatory. The use of this document and the use of "Holiday Wishes," which we have also concluded is self-laudatory, in the words of Canon 27, to which we will later refer, "offend the traditions and lower the tone of our profession and are reprehensible." Also, we note that "Curriculum Vitae" and the news clippings were not used solely for the purpose of furnishing information to defendants or insurance carriers but that copies of these documents were furnished to Edward Carter, Sylvia Hulliung and Irene Richardson. Also, the respondent testified: "The use of that 'Curriculum Vitae' during the year 1969 was made only where clients said they were going to terminate me. It was used maybe a dozen times out of the office and I can name the clients and the cases it was used with." Not only do we find the self-laudatory nature of this document to offend Canon 27, but we also find that the distribution of this material to Mrs. Hulliung and to clients to be objectionable.

We also consider the giving of "How Our Offices Handle Your Injury Claim" to Mrs. Hulliung while she was in the hospital to have been inappropriate. Although the giving of such a memorandum to clients may be proper and needed for their information and guidance, it is wrong to give such a document to someone who is not a client. The commissioners found "in the Hulliung case, though

Mr. Seeger is said by the respondent to have delivered such instruments and news clippings without his knowledge and against his previous instructions, the fact remains that they were so used for the purpose of persuading Mrs. Hulliung to employ the respondent as her attorney in connection with her injury case." This finding concerning solicitation is further supported by the fact that the medical authorization which respondent specifically authorized Seeger to have Mrs. Hulliung sign refers to the respondent and associates as "my attorneys." Also on June 3, 1969, about one week after Seeger contacted Mrs. Hulliung in the hospital the respondent wrote to Mr. and Mrs. Hulliung about the accident and Mrs. Hulliung's claim and stated "unless I hear from you either by phone call or return correspondence, I am assuming that you have gone over to your company's camp, have been reassured by your adjuster that you have nothing to worry about and you do not want to consider any further your uninsured motorist claim."

As to the Richardson case the commissioners found that although the respondent was told by Mrs. Richardson before the filing of the complaint in Madison County that she did not want him to act for her, he proceeded to file the complaint and sent Seeger and Graves to her home where they exerted unreasonable pressure upon her to retain respondent and where they made degrading statements concerning Schultzman, who had been employed by Mrs. Richardson. The commissioners found that such conduct could only tend to bring the legal profession into disrepute.

The commissioners considered the respondent's conduct in light of the Canons of Professional Ethics adopted by the Illinois State Bar Association June 4, 1938, as amended to July 13, 1968. The particular Canons pertinent to the present case are: Canon 17, which provides, "Clients, not lawyers, are the litigants. *** All personalities between counsel should be scrupulously avoided.

\*\*\*" Canon 27, which provides, "It is unprofessional to endeavor to procure professional employment through touters of any kind. Indirect advertisements for professional employment, such as furnishing or inspiring newspaper comments, \*\*\* and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible." Canon 28, which provides, "It is disreputable \*\*\* to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients \*\*\*."

Although the Canons of Ethics are not laws, they do constitute a safe guide for professional conduct and it has been established that in the interest of protecting the public, disciplinary measures may be imposed if the Canons are not observed. (*In re Moore,* 8 Ill.2d 373.) As commissioners of this court the Board of Governors of the Illinois State Bar Association has made certain findings of fact and conclusions from the evidence concerning violations of these Canons, which although not binding upon this court are nonetheless entitled to virtually the same weight as the findings of any initial trier of fact. ( *In re Reynolds,* 32 Ill.2d 331, 336.) The findings and conclusions of the commissioners referred to herein are amply supported by the record.

For the reasons stated above we adopt the recommendation of the Board of Governors of the Illinois State Bar Association and suspend the respondent from the practice of law for a period of one year and until further order of the court.

*Respondent suspended.*

MR. JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.