(No. 49982.—

*In re* MARSHALL I. TEICHNER, Attorney, Respondent.

*Opinion filed Jan. 12, 1979.—Rehearing denied March 30, 1979.*

KLUCZYNSKI, J., took no part.

RYAN, J., specially concurring.

Philip Schickedanz, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

Robert B. Oxtoby, of Springfield, and Sidney Z. Karasik, of Chicago, for respondent.

MR. JUSTICE CLARK delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a 14-count amended complaint against the respondent, Marshall I. Teichner, a Chicago attorney. The case was assigned to the Hearing Board panel for Springfield, which dismissed counts IV, VIII and XIII, found against the respondent regarding part or all of each of the remaining counts, and recommended that the respondent be suspended from the practice of law for a period of five years and until further order of this court. The Review Board affirmed the Hearing Board's dismissal of counts IV, VIII and XIII, and adopted the

Hearing Board's findings as to the remaining counts, but recommended that the sanction be suspension for three years and until further order of this court. The matter comes before us on respondent's exceptions to the report of the Review Board; we also have allowed oral argument and the filing of additional briefs.

The Administrator has not specifically excepted in this court to the dismissal of counts IV, VIII and XIII, and, accordingly, we need not consider them further. Those counts which survived the scrutiny of the hearing and review boards generally involve the respondent's allegedly improper solicitation of employment in the wake of two railroad disasters, a derailment and explosion in Laurel, Mississippi, on January 25, 1969 (see *Alabama Great Southern R.R. Co. v. Allied Chemical Corp.* (5th Cir. 1974), 501 F.2d 94, 96), and an explosion in Decatur on July 19, 1974 (see *People ex rel. Phillips Petroleum Co. v. Gitchoff* (1976), 65 Ill. 2d 249, 252).

Because respondent's conduct in the Laurel, Mississippi, incident occurred prior to the creation of the Attorney Registration and Disciplinary Commission, the Chicago Bar Association conducted the original inquiry into this matter under our former Rule 751(a) (43 Ill. 2d R. 751(a)), but apparently made no formal recommendation to this court in connection therewith. The Administrator apparently became aware of the Laurel incident only after filing his original complaint in this cause. Subsequently, the Administrator filed an amended complaint, of which count XIV contains the allegations regarding the Mississippi incident. Respondent objected to the inclusion of count XIV on the grounds that the delay between the original occurrence and inquiry and these proceedings was fundamentally unfair and therefore denied him due process of law. Both the Hearing Board and the Review Board were unpersuaded by this argument and so are we.

There is no statute of limitations governing our disciplinary proceedings. To constitute a bar to the maintenance of such proceedings, the delay must demonstrably have prejudiced the respondent's ability to present a substantial defense to the allegations. The mere passage of time is not enough. (See *In re Bossov* (1975), 60 Ill. 2d 439, 447.) We find that the respondent has failed to demonstrate the necessary prejudice in this case. He had adequate opportunity to confront and cross-examine those witnesses who testified against him, and he was not demonstrably hampered in obtaining and presenting evidence necessary to his defense.

The Laurel incident involved the derailment and explosion of a train operated by a subsidiary of the Southern Railway System. On January 25, 1969, at approximately 4:20 a.m., two jumbo tank cars, each containing approximately 32,000 gallons of liquid propane, derailed and exploded in Laurel. (See *Alabama Great Southern R.R. Co. v. Allied Chemical Corp.* (5th Cir. 1974), 501 F.2d 94, 96, *aff'd on rehearing en banc* (1975), 509 F.2d 539.) Among the killed and injured were many members of Laurel's black community. The Rev. Allen Johnson, pastor of the St. Paul United Methodist Church of Laurel and a leader in that community, established a comprehensive program of relief for the injured persons and their families. At about the same time, agents of the Southern Railway System began appearing in Laurel and negotiating settlement agreements with the injured. Rev. Johnson believed these settlement agreements to be inadequate and sought to obtain legal counsel for the injured and their families. Through his cousin in Chicago, Rev. Johnson contacted the respondent and asked him to come to Laurel. Rev. Johnson also sought assistance from lawyers all over the State of Mississippi, because it was his experience that local counsel in Laurel would not be satisfactory for the task at hand. At a meeting in Rev.

Johnson's church which respondent attended but did not address, several attorneys advised the persons in the audience of their legal rights in general terms. After the meeting, Rev. Johnson assigned some of his aides to accompany the respondent in visiting injured persons and their families.

Counsel for the railroad lost little time in responding to this counterattack upon the railroad's settlement practices. The railroad's Chicago attorney wrote the following letter to the president of the Chicago Bar Association:

> "Dear Joe:
>
> We represent the Southern Railway System. We are informed that in mid-January, 1969, the Southern had a serious derailment at Laurel, Mississippi, that destroyed some 35 houses, injured about 40 people and caused one death. To provide prompt relief for those harmed, many of whom were poor, the Southern promptly sent a large number of claim agents who worked around the clock with a board to make immediate settlements. A few days after the accident, Marshall I. Teichner, an attorney of 100 N. LaSalle Street, Chicago, Illinois, appeared in Laurel and went driving around, passing out business cards and seeking clients.
>
> This information is passed along to you for such investigation and possible disciplinary action as may seem appropriate. If further information is desired from the Southern, we will be glad to supply it.
>
> With warmest regards."

Respondent claims that the railroad's involvement in the instigation of the charges relating to the Laurel, Mississippi, incident fatally taints those charges and requires their dismissal. We disagree. Although the record reveals substantial involvement on the part of investigators employed by the railroad in the initial investigation of respondent's conduct in Laurel, we do not believe the record to be fatally tainted thereby. We also see no reason, on this record, to impugn the good faith of our attorney

registration and disciplinary system in its investigation of this matter once it obtained custody of the file from the Chicago Bar Association.

Although the Administrator charged respondent with several instances of misconduct in connection with the Mississippi incident, the hearing and review boards found that the Administrator had proved his case only with regard to two of the incidents, one involving Sears Ward, and another involving Dorothy Bunch Brown. Since the Administrator has not specifically excepted to the hearing and review board's findings regarding the other incidents, we need not consider them further.

With regard to the allegations involving Ward, the hearing and review boards found as follows:

> "Respondent, without invitation or request by Sears Ward, called upon Sears Ward in Laurel, Mississippi, at his place of business, identified himself as a lawyer and requested Mr. Ward's permission to talk with Ward's parents concerning the injuries they had sustained as a result of the railroad disaster and offered to advance money to Mr. Ward's parents if they needed it. Respondent on a later occasion came to the store where Ward worked and inquired of Ward if he had thought further about the proposition respondent had made to him concerning his representation of his parents.
> \*\*\*
> The actions and conduct of respondent in Laurel, Mississippi, with respect to the foregoing constitute the improper solicitation of a client and tend to bring the legal profession into disrepute."

The findings of the Hearing Board regarding disputed questions of fact, when affirmed or adopted by the Review Board, are entitled to approximately "the same weight as the findings of any trier of fact in our judicial system." (*In re Smith* (1976), 63 Ill. 2d 250, 255. Accord, *e.g., In re Bossov* (1975), 60 Ill. 2d 439, 441 (weight accorded findings of Commissioners under prior rule).) However, the nature of this court's role in disciplinary proceedings (see,

*e.g., In re Sherman* (1975), 60 Ill. 2d 590, 593), as well as the complexity and subtlety of the distinctions between permissible and impermissible forms of solicitation (compare, *e.g., People ex rel. Chicago Bar Association v. Edelson* (1924), 313 Ill. 601, and *In re Moore* (1956), 8 Ill. 2d 373, with *In re Damisch* (1967), 38 Ill. 2d 195, and *In re Hallett* (1974), 58 Ill. 2d 239) compel us to look further into the record to understand more precisely the nature of the respondent's conduct.

The record indicates that the respondent, accompanied by Wallace Dillon, a teacher at a local junior high school and aide to Rev. Johnson, visited Ward at a store he operated in Laurel. Although Ward was not a member of Rev. Johnson's congregation, he knew both Rev. Johnson and Dillon, was aware of Rev. Johnson's relief efforts, and agreed to talk with the respondent.

Ward's parents had been injured in the derailment and the respondent asked Ward's permission to speak with them in the hospital where they were being treated, and to offer them his services. There is no evidence that respondent asked Ward to request that his parents retain the respondent, although there is some evidence that either the respondent or Dillon offered to advance money to Ward's parents for their medical needs. Respondent also inquired as to whether the Wards were receiving proper medical attention. Ward nonetheless declined to give respondent permission to visit Ward's parents in the hospital. Respondent returned to Ward's store on a subsequent occasion, ostensibly to use a public telephone, at which time respondent again asked permission to visit Ward's parents to discuss his representation of them and Ward again refused.

Respondent denies that the foregoing conduct constituted the "improper solicitation of a client" and, alternatively, argues that his conduct was constitutionally protected.

The record clearly and convincingly demonstrates that respondent solicited employment by the elder Wards. That respondent never displayed a contract nor specifically requested Ward to recommend respondent to Ward's parents does not preclude our finding that, in context, the only reasonable conclusion that can be drawn from respondent's words and conduct is that he was seeking employment by the Wards. "Circumstantial evidence is legal evidence and neither the commissioners nor this court are required to be naive or impractical in appraising an attorney's conduct." (*In re Krasner* (1965), 32 Ill. 2d 121, 127.) Respondent's in-person communication with the elder Wards' son, whom respondent reasonably could expect to play an important role in his injured, hospitalized parents' decision, is, in this context, indistinguishable from communication directly with Ward's parents themselves. The contents of that communication indicated respondent's desire to be employed by the Wards and potential benefits which they might derive from that relationship, such as a loan to pay for certain of their medical expenses. Thus we find that the Administrator has, *prima facie,* met his burden of proof.

However, we also agree with the respondent that his conduct was constitutionally protected. Several decisions of the United States Supreme Court have established that, to protect the right of individuals to associate for the advancement of beliefs, ideas (*NAACP v. Button* (1963), 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328) and individual economic interests (*Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar Association* (1964), 377 U.S. 1, 12 L. Ed. 2d 89, 84 S. Ct. 1113), the fourteenth amendment to the United States Constitution limits the power of the States to prohibit certain types of communications between attorneys and their potential clients. In addition, to protect the free flow of information regarding the availability and cost of legal services to

potential clients, the court has sharply curtailed the power of the States to regulate published advertising by attorneys. (*Bates v. State Bar* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691.) Finally, only recently has the court attempted to come to grips with the problem expressly reserved in *Bates,* the permissible scope of State regulation of in-person solicitation by attorneys. See *In re Primus* (1978), 436 U.S. 412, 56 L. Ed. 2d 417, 98 S. Ct. 1893; *Ohralik v. Ohio State Bar Assn.* (1978), 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912.

In *Ohralik,* the respondent attorney, Albert Ohralik, was picking up his mail at the local post office, when he learned from the postmaster's brother that Carol McClintock, with whom he was casually acquainted, had been injured. He called her parents, who said she was in the hospital. When he suggested that he might visit her there, they assented but asked that he talk with them first. When Ohralik called upon the McClintocks they told him that she was driving the family car when struck by an uninsured motorist, injuring both her and her passenger. Ohralik assured the McClintocks that the Ohio guest statute protected them from liability to her passenger. He then suggested that Carol needed a lawyer, to which suggestion Carol's mother responded that the decision was Carol's.

Ohralik then visited Carol, who was still lying in traction in the hospital. He asked her to sign an agreement permitting him to represent her. She refused, explaining that she first wanted to discuss the matter with her parents. Ohralik did, however, photograph Carol in her then current condition, and also photographed the scene of the accident. He then visited Carol's parents again, this time carrying a concealed tape recorder. Carol eventually signed a contingent-fee contract with him.

Ohralik also visited Carol's passenger, again carrying a concealed tape recorder. The passenger, 18 and not yet a high school graduate, indicated that she did not know

what was going on, but said "O.K." to Ohralik's oral request to represent the passenger in her claim under Carol's uninsured motorist clause, in return for one-third of the recovery.

When the passenger's mother attempted to disavow this agreement, respondent resisted, thereby holding up settlement with the insurance company. Carol also discharged the respondent but paid him a whole third of the $12,500 recovery. She paid another lawyer $900 to represent her in obtaining the eventual settlement of her claim.

The Supreme Court of Ohio suspended Ohralik indefinitely (48 Ohio St. 2d 217, 357 N.E.2d 1097), and the United States Supreme Court affirmed. In the companion case, however (*In re Primus*), the respondent attorney, Edna Primus, was affiliated with the South Carolina branch of the American Civil Liberties Union, but received no compensation for this aspect of her practice. She did, however, receive a retainer from the Carolina Council on Human Relations, through which she was asked by Gary Allen, a local businessman and community activist, to address a group of women on welfare who had undergone surgical sterilization. Primus advised them of their legal rights, including the possibility of bringing suit against persons responsible for their sterilization.

Subsequently, the ACLU told Primus that it would sponsor the bringing of such a suit (though there was no evidence that Primus herself would have received compensation in connection therewith). After Allen told Primus that Mrs. Mary Etta Williams, who had attended the meeting, wanted to file such a suit, Primus wrote to her informing her of the ACLU's offer. The South Carolina Supreme Court issued a public reprimand to Primus (268 S.C. 259, 233 S.E.2d 301), but the United States Supreme Court reversed. Although the holdings of *Primus* and of *Ohralik* each can be stated quite narrowly and thereby

readily distinguished (see 436 U.S. at 468-71, 56 L. Ed. 2d at 461-63, 98 S. Ct. at 1925-27 (Marshall, J., concurring in part and concurring in the judgments)), the court has used these cases as vehicles for articulating its analysis of the application of the guarantees of the first and fourteenth amendments to communications between lawyers and their potential clients regarding employment.

The court began its analysis by observing that the most important purposes of the first amendment are the protection of the rights of individuals to associate and of the free flow of information necessary to facilitate the expression of beliefs and ideas. (See 436 U.S. 412, 431-32, 56 L. Ed. 2d 417, 434-35, 98 S. Ct. 1893, 1904-05; 436 U.S. 447, 456, 56 L. Ed. 2d 444, 453, 98 S. Ct. 1912, 1918.) The court then observed that protection of the free flow of "purely commercial" information would inevitably weaken the protection of ideologically tinged expression. (436 U.S. 447, 455-56, 56 L. Ed. 2d 444, 453, 98 S. Ct. 1912, 1918.) Accordingly, the court reasoned that purely commercial expression could be more severely restricted than other forms of expression. (436 U.S. 447, 456, 56 L. Ed. 2d 444, 453, 98 S. Ct. 1912, 1918.) The court concluded that an attorney, such as Ohralik, whose interest in a case was purely commercial, could be more severely restricted in his expression than an attorney, such as Primus, whose interest was purely ideological. The restriction on the former, the court held, could include a prohibition of in-person solicitation, as a prophylactic measure to prevent fraud, undue influence, intimidation, overreaching and other forms of vexatious conduct. (436 U.S. 447, 460-67, 56 L. Ed. 2d 444, 456-60, 98 S. Ct. 1912, 1922-24.) In the case of the latter, however, only very narrowly drawn proscriptions of particular, harmful conduct would be permissible. (436 U.S. 412, 438, 56 L. Ed. 2d 417, 439, 98 S. Ct. 1893, 1908. But see 436 U.S. 412, 439-40, 56 L. Ed. 2d 417, 439-40, 98 S. Ct.

1893, 1909 (Blackmun, J., concurring).) The court recognized that the line ("based in part on the motive of the speaker and the character of the expressive activity") between "associational activity for the advancement of beliefs and ideas" and activity for the "advancement of [one's] own commercial interests *** will not always be easy to draw," but concluded "that is no reason for avoiding the undertaking." 436 U.S. 412, 438 n.32, 56 L. Ed. 2d 417, 438 n.32, 98 S. Ct. 1893, 1908 n.32. But see 436 U.S. 412, 443, 56 L. Ed. 2d 417, 442, 98 S. Ct. 1893, 1910-11 (Rehnquist, J., dissenting).

Thus, the court suggests that, where the conduct of an attorney falls between the two extremes of Primus, who had a strong ideological interest and no pecuniary interest, and Ohralik, who had a strong pecuniary interest and no ideological interest, this court must first attempt to determine whether the attorney's motive and function entitle his speech and conduct to the greater protection afforded associational activity for the advancement of beliefs and ideas.

In the instant case, we are faced with an attorney whose activities are tinged with the sort of associational values strongly protected by the first and fourteenth amendments, yet whose intent to benefit financially also is unmistakable. If we were to base our judgment solely upon what we believe to be the prevailing motive of the respondent, we would have to conclude that his motive was pecuniary, not ideological. (*Cf., e.g., People ex rel. Chicago Bar Association v. Edelson.*) Yet our analysis cannot stop there, for as Mr. Justice Marshall aptly pointed out in his separate opinion, activity and expression which fall within the core of protected first amendment values do not automatically lose their protection because the actor or speaker stands to benefit financially from his actions. (436 U.S. at 473, 56 L. Ed. 2d at 464, 98 S. Ct. at 1928. See also *UMW v. Illinois State Bar Association*

(1967), 389 U.S. 217, 19 L. Ed. 2d 426, 88 S. Ct. 353; *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710; *Thomas v. Collins* (1945), 323 U.S. 516, 89 L. Ed. 430, 65 S. Ct. 315.) It is the flow of information and the effective association of individuals which are protected. See, *e.g., First National Bank v. Bellotti* (1978), 435 U.S. 765, 55 L. Ed. 2d 707, 98 S. Ct. 1407.

Here, a railroad disaster injured a large number of people in Laurel's black community. The railroad's agents almost immediately began to settle legal claims with members of that community, who, by the railroad's own admission, needed the money. Yet to obtain that money, they had to release any and all claims against the railroad. Unable to afford legal counsel, the injured and their families probably were less able to evaluate the fairness of the proposed settlements. Illinois courts are not unfamiliar with the abuse and the "mutual mistakes of fact" which can result from such hasty, uncounseled settlements. See, *e.g., In re Estate of Lilly* (1976), 41 Ill. App. 3d 348, 353 ("possibly misleading tactics of the adjuster"; possibility of greater recovery if an attorney had pressed for it); *Florkiewicz v. Gonzalez* (1976), 38 Ill. App. 3d 115, 120 (undue haste). See generally *Clancy v. Pacenti* (1957), 15 Ill. App. 2d 171, 174-75 (greater potential for error).

Faced with this situation, Rev. Johnson sought to obtain legal counsel for the members of his community. Unable to pay for such legal counsel, the only attorneys he could turn to were those willing to operate on a contingent-fee basis.

We find it crucial that, in turning to the respondent for help, Rev. Johnson was not attempting to create a facade or device designed to facilitate the respondent's solicitation of remunerative employment (*cf. In re Primus* (1978), 436 U.S. 412, 428 n.20, 56 L. Ed. 2d 417, 432 n.20, 98 S. Ct. 1893, 1903 n.20 (no evidence of "sham")),

but rather was acting as part of a *bona fide* relief effort created to further interests independent of the respondent's interest in remunerative employment. Thus, even though the respondent's motives were predominantly pecuniary, his conduct served to further the interests of Rev. Johnson's community, and a blanket prohibition of all contact between respondent and that community would not pass constitutional muster.

We recognize that, at least where associational values are not implicated, in-person solicitation "for pecuniary gain" may be prohibited, and that, even where such values are implicated, "carefully tailored regulation that does not abridge unnecessarily the associational freedom of non-profit organizations, or their members, having characteristics like those of the NAACP or the ACLU" also has not been foreclosed. (*In re Primus* (1978), 436 U.S. 412, 439, 56 L. Ed. 2d 417, 439, 98 S. Ct. 1893, 1908-09.) Thus, prohibition of in-person solicitation of contingent-fee contracts by attorneys operating at the behest of nonprofit organizations might well be among the types of restrictions which the United States Supreme Court would approve. Nonetheless, we decline to prohibit all such solicitation.

For all its abuses and excesses (see *Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 83), the contingent-fee system remains almost the only route to the courthouse for individuals of moderate means. (See *In re Estate of Harnetiaux* (1968), 91 Ill. App. 2d 222, 228.) To deny Rev. Johnson's community the use of such attorneys to consult with the injured and their families on an individual basis would be to shut that community off from the most important, if not the only, source of the legal counsel they needed but could not afford. There is no evidence that, with regard to Ward, respondent's conduct involved any of the substantive evils against which the prohibition of in-person solicitation traditionally is directed. Nor was

respondent's offer of financial assistance necessarily improper. This court long ago rejected any rule which would permit indigent plaintiffs to be forced into a hasty, inadequate settlement by their indigency. (*People ex rel. Chicago Bar Association v. McCallum* (1930), 341 Ill. 578, 589; Accord *Bounougias v. Peters* (1964), 49 Ill. App. 2d 138, 154. But *cf.* generally *Annot.* 8 A.L.R.3d 1155 (1966).) Accordingly, we deem it inappropriate to impose discipline for respondent's conduct with respect to Sears Ward.

The second instance of alleged misconduct in Laurel, Mississippi, involved respondent's contact with Mrs. Dorothy Bunch Brown. The Hearing Board found:

> "Respondent came to the home of Dorothy Bunch Brown in Laurel, Mississippi, and asked her to sign a contract of employment. Mrs. Brown [subsequently] did sign a contract of employment, \*\*\* at which time Respondent gave her $100.00 in cash and offered to give Mrs. Brown $80.00 per week thereafter. She had previously received the sum of $100.00 from a man by the name of Cornelius. Payments by Respondent to Mrs. Brown totalled $500.00."

There is no significant evidence in the record connecting "Cornelius" with the respondent. We reject respondent's argument, however, that the Hearing Board found otherwise, therefore indicating its confusion on this point. Rather, since Mrs. Brown claimed that Cornelius was somehow connected with respondent, and since Mrs. Brown also claimed that she received a total of $600, including the $100 from Cornelius, it is clear that, by finding that respondent's payments totaled only $500, the Hearing Board rejected certain aspects of Mrs. Brown's testimony on this point.

Mrs. Brown was, by her own admission, somewhat hampered in her memory of the events in Laurel in 1969, by the passage of time. However, there are certain aspects of respondent's transaction with Mrs. Brown which are

undisputed. First, it is undisputed that respondent offered to represent Mrs. Brown for a contingent fee. Second, it is further undisputed that the respondent advanced $500 to Mrs. Brown, apparently as a loan against the proceeds of her claim. Finally, it is also clear to us from the record that, as in the case of Sears Ward, the respondent visited Mrs. Brown in the company of an aide to Rev. Johnson as part of Rev. Johnson's program of providing legal assistance to the injured members of the community. Here, too, we find the evidence clear and convincing that respondent's motive was pecuniary, not ideological, in offering to represent Mrs. Brown for a substantial contingent fee. Yet, as in the case of Sears Ward, to prohibit this type of communication would be to deny legal assistance to persons in Mrs. Brown's position. Given the very limited weight which can be given to Mrs. Brown's testimony, we do not find clear and convincing evidence of overreaching or other improper conduct by the respondent in these circumstances which would justify the imposition of the disciplinary sanction.

We therefore decline to impose any sanction with regard to respondent's conduct in Laurel, Mississippi.

We now turn our attention to the counts dealing with the Decatur, explosion. In count I of his amended complaint the Administrator charged that the respondent offered to pay Mrs. Connie Snoke, an employee of an automobile rental agency at the Decatur airport, to introduce him to injured persons and their acquaintances and relatives. The Hearing Board found "[r]espondent solicited the aid and assistance of Mrs. Connie Snoke *** for the purpose of contacting individuals injured as a result of the Decatur explosion and obtaining employment by them." Although the record indicates only that Mrs. Snoke testified that respondent "told me that if I would give him some names and addresses of people that worked on the railroad he would pay me and pay them," the surrounding

circumstances indicate that the respondent's intent was not to obtain the names of witnesses but, rather, names of potential clients, and therefore warrants discipline.

Counts II and III relate to the respondent's action in soliciting employment from Ruth Garner and her husband. The Garners' home was damaged by the explosion, and members of the Garner family temporarily were scattered, living in various locations. A friend of Mrs. Garner, Mrs. Stubblefield, told respondent "about Mrs. Garner's problems, and thought she was very confused and up in the air about things, and thought she would need good legal advice ***." Mrs. Stubblefield evidently offered to call Mrs. Garner and inform her of the availability of respondent's services. It is undisputed, however, that respondent did not wait to hear from Mrs. Garner but, instead, called her and arranged to meet her and her husband. When he arrived, she was, understandably, very upset. Her home was damaged, her family was scattered, and her insurance adjuster was unsympathetic to her desire to obtain temporary housing elsewhere to keep her family together. Nonetheless, respondent saw fit to seek employment, on a contingent-fee basis, with Mrs. Garner at this time. (Although there is no evidence that respondent asked her to sign a contract, it is clear that he was seeking to be retained on a contingent-fee basis.) Later that day, the respondent returned to the Garners' house, where Jerry Garner met the respondent outside, told him that he and his wife did not wish to retain an attorney at this time, whereupon respondent left.

We agree with the hearing and review boards that discipline may be imposed for the conduct demonstrated by the evidence adduced with regard to counts I, II and III. Respondent's actions with regard to Connie Snoke and the Garners furthered the associational rights of no person or group. Nor, on balance, did his actions further the dissemination of truthful information about the avail-

ability of legal relief and legal services to members of the public who were in need of such information. There is no credible evidence in this record to indicate that the Garners indicated a desire to meet with the respondent before the respondent contacted them. Rather, quite the opposite is true. Respondent knew only that the Garners might have need of legal assistance, and from this he sought to insure that the legal assistance they received was his. Even if the respondent did not know, as he did, that Mrs. Garner was in no condition to calmly consider whether to sign away one-third of her claim in return for representation by the respondent, it would have been improper for the respondent to have arranged an appointment with the Garners without their having approached him first. The mere fact that the respondent thought he had been able to manipulate one of Mrs. Garner's friends to introduce him to the Garners was insufficient to justify his having contacted them without an indication of interest on their part.

That respondent was seeking to represent the Garners in return for a very substantial contingent fee is an aggravating factor in this case, even though the respondent did not ask Mrs. Garner to sign a contract at their first meeting. Although the economic imperatives which support the contingent-fee system also impel us to refrain from prohibiting its use by a community leader (such as Rev. Johnson in Laurel, Mississippi) to provide legal advice to persons who otherwise would not receive it, such considerations apply with substantially lesser force to respondent's conduct with regard to the Garners. Rather, the possible bad effects which obtain from the contingent-fee system predominate here. For example, the high cost (one-third of any settlement and up to 40 or 50 percent of any judgment obtained after trial and appellate litigation) of the contingent fee proposed here might not be justified in the minds of potential clients by the additional benefits,

*i.e.,* higher recovery, obtained through the services of an attorney. In addition, an attorney with an interest in his client's recovery may tend to be less sensitive to a client's desire to avoid the trauma of litigation. Indeed, Mrs. Garner's doctor advised her that, for health reasons, she should avoid such trauma for the time being.

In *Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 83, this court observed:

> "Contingent fee contracts do have the practical effect of giving an attorney a pecuniary interest in the successful prosecution of the litigation and, therefore, it is felt that unless absolutely fair they will adversely affect the usual attorney-client relationship. [Citation.] For this reason, and because such contracts sometimes lead to solicitation and otherwise bring disrepute to the law, they are closely scrutinized by the courts."

Attorney-client disputes that result from such contingent-fee contracts are legion, and therefore, for the foregoing reasons, we conclude that the substantial contingent fee proposed by respondent is an aggravating factor in this case.

Counts V through VII and IX and X involve the respondent's solicitation of the family of Darryl K. Hardy while he lay hovering between life and death as a result of burns sustained in the Decatur explosion, and of Leesa Hulvey, the late Hardy's fiancee. The hearing and review boards made the following findings with regard to these counts which, with one exception, we find to be amply supported by the record:

> "Respondent, with the assistance of Robert Lichtenberger, with whom Respondent had arranged for introductions and names and addresses of persons injured in the Decatur explosion, approached Leesa Hulvey and solicited from her employment to represent her for claims for injuries sustained by her boyfriend and fiance, Darryl Hardy."

"Respondent, further, approached Mr. and Mrs. Hulvey, the parents of Leesa Hulvey, and solicited their assistance in convincing [her] to sign contracts of employment with Respondent."

"Respondent, without invitation, approached Barbara Hardy, the mother of Darryl Hardy, a seriously injured burn victim of the railyard explosion in Decatur, Illinois and requested employment *** to represent her in connection with the injuries to her son."

"Respondent, without invitation, approached Brenda K. Hardy, the divorced wife of Darryl Hardy and requested her to employ Respondent in connection with any cause of action she or her minor child [Darryl, Jr.] might have as a result of the explosion in the railroad yards at Decatur, Illinois."

Respondent's approach to Barbara Hardy was not uninvited. On the contrary it would appear that, because Lichtenberger was related by marriage to the elder Mrs. Hardy, Mrs. Hardy asked to meet with respondent, whose services she evidently found satisfactory. (She continued to employ him at the time she gave a deposition in this cause.) With regard to the other findings, however, there is more than ample support in the record.

The evidence indicates that Robert Lichtenberger called Barbara Hardy several times after the accident to inquire about her son Darryl. Darryl evidently had said during one of his moments of consciousness, "I got a railroad to sue," which Barbara repeated to Lichtenberger. Lichtenberger in turn suggested that Barbara call the respondent. She did and asked him to come talk to her. When he did, she suggested that he speak to Leesa, Darryl's fiancee. After speaking with Leesa, respondent returned the next day to again discuss his retention by Barbara, who then agreed to be represented by respondent. Respondent thereupon loaned Barbara money and explained that she and her son's fiancee, Leesa, and her son's ex-wife, Brenda (mother of Darryl, Jr.), would "work together" in their lawsuit.

Barbara, however, still was wary of Brenda's feelings toward her. There is no evidence that respondent disclosed the existence of any possible conflict of interest in the joint representation he proposed.

The evidence further indicates that respondent, either himself or with the assistance of Robert Lichtenberger, introduced himself to Leesa at the hospital where Darryl was being treated. When respondent asked Leesa whether she had an attorney, she said she did not but wanted to discuss the matter with her parents first. Leesa gave respondent her parents' phone number and he contacted them. In respondent's conversation with the Hulveys, they emphasized their desire to see Leesa marry Darryl, with whom she had been living. The Hulveys agreed to respondent's representation of their daughter and themselves signed contracts with the respondent.

Respondent agreed to look into the question of facilitating the marriage of Darryl and Leesa, but there is no clear and convincing evidence of a *quid pro quo* relationship between the respondent's attempts to facilitate the marriage of Darryl and Leesa and the Hulveys' agreement to encourage Leesa to retain the respondent.

When respondent met with Mr. and Mrs. Hulvey and Leesa, she accepted their advice to retain respondent. Subsequently, respondent loaned Leesa $200 to repay the identical amount which she had "borrowed" from the railroad claims agent stationed at the hospital where the burn victims were being treated.

Respondent also went to the home of Brenda Hardy, Darryl, Sr.'s ex-wife and mother of Darryl, Jr. Respondent asked to represent her personally and on behalf of her minor child in any action she might have for the death or injury to Darryl. She agreed, and afterwards he gave her either $200 or $300. There is no evidence that respondent discussed with Brenda the potential conflict of interest in the joint representation.

After Darryl died, Brenda spoke with respondent at the funeral home and said that she wanted to discuss her situation with the attorney who had handled her divorce. Respondent opposed this suggestion, according to Brenda. It is interesting to note that there was an arrearage in the support payments for Darryl, Jr., resulting from Darryl, Sr.'s injury, but not even this obvious potential conflict of interest slowed respondent from recommending that everyone even remotely connected with Darryl's claim retain respondent.

Count XI deals with the respondent's relationship with Robert Lichtenberger, a resident of Decatur who was injured in the explosion. The hearing and review boards found as follows:

> "*** Respondent requested the assistance of John Bolero in obtaining introductions to individuals injured as a result of the Decatur, Illinois explosion."

> "As a result of this request, Respondent received a call from Robert Lichtenberger and made an appointment to meet Robert Lichtenberger in Decatur, Illinois."

> "After his arrival in Decatur, Illinois, Respondent solicited employment by Robert Lichtenberger, and requested Robert Lichtenberger to assist Respondent in securing the names of other individuals injured by the explosion and arranging appointments for Respondent to meet with such individuals."

> "Respondent paid Robert Lichtenberger the sum of $500.00 in cash for his assistance in this regard."

With one exception, we find the evidence, on balance, clear and convincing in support of the findings of the hearing and review boards on this count. The evidence indicates that respondent had been dating Mary Bolero (a native of Decatur then living in Chicago) for some time prior to the explosion in Decatur. The day after the explosion, Miss Bolero called her father from respondent's apartment, as she had in the past. Miss Bolero evidently told her father, John Bolero, that respondent was a lawyer

specializing in plaintiff's personal injury work and asked if he knew anyone who might be interested in respondent's services. Bolero indicated that he did and spoke with respondent to ask respondent's permission to recommend him to Robert Lichtenberger, who was the son of a friend of Bolero. Respondent gave Bolero permission to make such a recommendation. We find the evidence insufficient, however, to support the finding of the hearing and review boards that respondent asked Bolero to solicit Lichtenberger on respondent's behalf.

Lichtenberger called respondent and they arranged to meet in Decatur. However, before respondent arrived in Decatur, Lichtenberger already had obtained counsel through a labor union referral service. Lichtenberger testified that he offered to make amends to respondent by introducing him to other potential clients. The respondent subsequently paid Lichtenberger several hundred dollars, which payment respondent claims was for "legwork" and not for solicitation. However, it is undisputed that Lichtenberger recommended respondent to Barbara Hardy and Shirley Tucker (although now Shirley Tucker Shields, we will refer to her as Shirley Tucker), and, while not undisputed, it also appears that Lichtenberger introduced respondent to Leesa Hulvey. The amount of money involved is grossly disproportionate to the amount of legwork Lichtenberger had performed or was likely to perform in the near future. Nor do we believe it was, as respondent suggests, intended to buy a car to assist Lichtenberger in performing those services. Rather, in light of the surrounding circumstances, we think the only reasonable conclusion that can be drawn from this transaction is that respondent was compensating Lichtenberger for past and future services in the solicitation of clients. *Cf.* generally *In re Damisch* (1967), 38 Ill. 2d 195, 207.

Finally, in count XII, the hearing and review boards

found:

> "Through *** Lichtenberger, Respondent approached Shirley Tucker and sought employment by her to represent her in connection with her claims for injuries sustained as a result of the railyard explosion in Decatur, Illinois."

> "Respondent requested Shirley Tucker to call other individuals whom she knew and who had been injured in said explosion for the purpose of obtaining employment by said individuals."

We find the evidence, on balance, clear and convincing in support of these findings. Shirley Tucker testified on two separate occasions that Lichtenberger recommended respondent to her, that she and respondent met subsequently, and that she retained respondent. After retaining respondent, Miss Tucker asked if she could call friends of hers who lived in Indiana and Missouri to recommend respondent to them. (On one occasion, she testified that he asked her to make the calls. She subsequently retracted that statement, however.) He agreed and gave her $100, of which he claims part was to cover the cost of the phone calls and part was intended as a loan. We conclude, however, that, like the money paid to Lichtenberger, a substantial portion of this money was intended to reward and induce Shirley Tucker's assistance in the solicitation of clients for respondent.

Although the offense of solicitation does not, in itself, import "venality, fraudulent practices or moral turpitude" (*In re Krasner* (1965), 32 Ill. 2d 121, 129), respondent's ancillary misconduct, particularly with regard to Ruth Garner and the Hulvey and Hardy families, demonstrates a gross deviation from the minimum standards of conduct expected of persons licensed to practice law in this State. Respondent's insensitivity to Mrs. Garner's inability to adequately evaluate her need for legal counsel (*cf., e.g.,* Illinois Code of Professional Responsibility, Disciplinary Rule 2–104 (1977)) and his complete disregard of the

conflicts inherent in the Hardy-Hulvey family situation (*cf., e.g.,* Professional Ethics Opinion No. 363, 60 Ill. B.J. 151 (1971); H. Drinker, Legal Ethics 105 (1953); Illinois Code of Professional Responsibility, Disciplinary Rule 5—105 (1970)) are examples of conduct which disserves the goal of making information about legal services available, because it dissuades individuals from seeking legal counsel.

Finding no merit in respondent's other arguments, we order that the respondent be suspended from the practice of law for 2 years.

*Respondent suspended.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.

MR. JUSTICE RYAN, specially concurring:

Although I concur in the conclusion of my colleagues as to the sanction imposed upon the respondent, I cannot agree that his conduct in Mississippi is not the proper subject of disciplinary action.

The majority opinion finds that the respondent's solicitation activities in Mississippi were tinged with associational values protected by the first and fourteenth amendments. I do not agree. The United States Supreme Court recently decided *In re Primus* (1978), 436 U.S. 412, 56 L. Ed. 2d 417, 98 S. Ct. 1893, and *Ohralik v. Ohio State Bar Assn.* (1978), 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912. Both of these opinions were filed on the same day. *Primus* involved activities and solicitation on behalf of an association in furtherance of the ends of the assoication and did not involve any commercial solicitation of business for the financial benefit of the attorney. *Ohralik,* on the other hand, involved no associational activities but did involve personal solicitation by the attorney for contingent-fee contracts. The only difference between our respondent's activities in

Mississippi and those of the attorney in *Ohralik* is the nebulous associational relationship which the majority finds present in our case. This relationship is apparently not with Rev. Johnson's church, nor was the solicitation to further its ends, because some of those solicited were not members of the church. The association which the majority finds renders this otherwise improper solicitation permissible is indefinitely defined as "Rev. Johnson's community." There is no organization in existence with which the respondent was associated. Rev. Johnson stood as a self-appointed person in the community conducting what he thought was a helpful effort. The opinion in this case fulfills the prophetic statement of Mr. Justice Rehnquist in his dissent in *Primus:*

> "And we may be sure that the next lawyer in
> - Ohralik's shoes who is disciplined for similar
> conduct will come here cloaked in the prescribed
> mantle of 'political association' to assure that
> insurance companies do not take unfair advantage
> of policyholders." 436 U.S. 412, 442, 56 L.
> Ed. 2d 417, 441, 98 S. Ct. 1893, 1910.

There is nothing in either *Primus* or *Ohralik* that requires that this court refrain from imposing sanction on the respondent for his solicitation in Mississippi. The majority opinion has gone far beyond the holding in *Primus.* The United States Supreme Court, by its holdings in the two cases cited, has defined an area of permissible solicitation and an area of impermissible solicitation. Admittedly there is a substantial undefined area between these two poles that must be charted. However this is the United States Constitution that is being interpreted. If further deviation is to be had from what has been heretofore viewed as acceptable limitations on commercial speech (solicitation of clients), the United States Supreme Court, and not this court, should define the further expanded boundaries. Otherwise the area of commercial

118

solicitation by an attorney which we may find to be protected by the first and fourteenth amendments may subsequently be found by the United States Supreme Court to constitute conduct not falling within these constitutional protections. The majority opinion relies to a great extent upon language used by Mr. Justice Marshall and by Mr. Justice Blackmun in their concurring opinions. The language of these two justices was not concurred in by other members of the court and should not be read as an indication that the United States Supreme Court did extend the constitutional protection of commercial speech to the solicitation carried on by our respondent. Just as this concurring opinion represents only the beliefs of its author, and not the holding of the court, so also must we view the language of Mr. Justices Blackmun and Marshall.