In the Matter of the Application for the
DISCIPLINE OF Robert John APPERT
and Gerald Gordon Pyle, Attorneys at
Law of the State of Minnesota.

No. 48803.

Supreme Court of Minnesota.

Dec. 17, 1981.

Michael J. Hoover, Director, and Richard C. Baker, Staff Attorney, Lawyers Professional Responsibility Board, St. Paul, for appellant.

Jack S. Nordby, St. Paul, for respondent.

Linda M. Ojala and John C. Hottinger, Minnesota Civil Liberties Union, Mankato, amicus curiae.

YETKA, Justice.

These proceedings began in November of 1977 with a notice from the Lawyers Professional Responsibility Board to the respondents. The notice warned of possible violations of the prohibitions against attorney advertising and solicitation contained in the Code of Professional Responsibility. A hearing was held before the Board on March 31, 1978, and as a result a petition for disciplinary action against the respondents was filed on or about April 7, 1978. On November 17, 1978, another hearing before the Board was held and was followed by a supplementary petition for discipline filed on or about May 16, 1979. This court appointed the Honorable Clarence A. Rolloff, Retired Judge of District Court, to act as referee. The referee's hearing was held on November 13, 1979, and the case was submitted on a record of stipulated facts, transcripts of prior proceedings and certain documents. Judge Rolloff issued his Findings, Conclusions and Recommendation for Discipline on February 21, 1980. The recommendation called for a public reprimand of the respondents and the imposition of a substantial fine. The proceeding is now before this court for a review of the referee's determination that respondents had violated the disciplinary rules and the recommended disposition of the case. We find no discipline warranted and dismiss the petition.

The facts as found by the referee are not generally contested by the parties. Because the facts are particularly important, however, they are set forth here in some detail.[1]

The respondent Robert Appert was admitted to practice law in Minnesota in 1973, and the respondent Gerald Pyle was admitted to the Minnesota bar in 1976. During all times relevant hereto, they were law partners engaged in the general practice of law in Minneapolis.

---

1. We note initially that the statements concerning the activities of the A. H. Robins Company made in this opinion are intended to reflect only the contentions of respondents to the disciplinary proceedings and are not indicative of any judicial determination of these issues as it might affect A. H. Robins. A. H. Robins has never been a party to and did not present evidence concerning the allegations in these proceedings.

In late 1975 and early 1976, Appert began representing clients in products liability litigation against the A. H. Robins Company (Robins). Each of those clients claimed to have been injured by a "Dalkon Shield," an intrauterine contraceptive device manufactured by Robins. Pyle also began handling Dalkon Shield litigation after he joined Appert in the practice of law in January of 1977.

Respondents' handling of such litigation occurred after sales of the Dalkon Shield in the United States had been suspended by Robins. After national marketing of the Dalkon Shield had been begun by Robins in or about 1970, a variety of medical problems were claimed to have been caused by the device. Numerous civil actions involving the Dalkon Shield have been initiated against Robins across the country. Injuries claimed to have been suffered include septic abortions, miscarriages, uterine infections resulting in infertility, and severe cramping and bleeding.

The device was aggressively advertised by Robins even after these problems were brought to its attention. Moreover, Robins allegedly misrepresented these problems to members of the medical community and allegedly made no disclosure to the public generally concerning the possible dangers connected with the device. The various lawsuits have included claims of negligence, breach of implied warranty, breach of express warranty, strict liability, misrepresentation under section 402B of the *Restatement of Torts*, civil conspiracy, gross and wanton negligence, willful misrepresentation, fraud, and violation of local consumer protection statutes.

In June of 1977, the respondents reviewed the decision in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), and concluded that it permitted them to advertise for Dalkon Shield clients so long as the ads were not false, deceptive or misleading. In August and September of 1977, the respondents prepared and had printed a brochure entitled "Women who have used Dalkon Shield may be entitled to Financial Compensa-

tion." Of the 10,000 copies of the brochure that were printed, some 200 to 500 copies were actually distributed. Respondents distributed some of the brochures in response to specific inquiries for information about the Dalkon Shield and others were given to clients who merely expressed an interest in Dalkon Shield litigation.

In addition to the brochure, the respondents prepared and distributed a letter-type circular that described problems with the Dalkon Shield, noted the respondents' experience in litigation of Dalkon Shield cases and suggested further contact with the respondents. Between August and November of 1977, the respondents sent the letter to approximately 150 to 250 people. The recipients of the letter included friends, clients and former clients whose names appeared on a mailing list compiled by respondents. The respondents had no reason to believe that the parties on the mailing list had ever used the Dalkon Shield or experienced problems with it.

One of the respondents' admitted purposes in distributing the brochure and the letter was to generate legal business. The referee found that Dalkon Shield litigation represented a significant and lucrative portion of the respondents' practice, that the distribution of the brochure and letter resulted in an estimated minimum of 75 new cases for the respondents, and that the average settlement per case was $10,000, with respondents receiving one-third of each settlement.

It is noteworthy that the respondents only began distribution of the brochure and the letter after they had determined that such distribution was permissible under *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). The parties have agreed that some persons first learned of their legal rights or medical injuries through the brochure and the letter and that such persons would not have been so informed if those materials had not been distributed. The Board does not contend that the legal work performed in the cases handled by the respondents was in any way unsatisfactory or that the fees charged for

such work were unreasonable. Immediately upon the receipt of notice of possible disciplinary violations from the Board, the respondents stopped distributing the brochure and the letter. The referee specifically found that nothing contained in the brochure or the letter contained material that was false, deceptive or misleading.

Antioch Communiversity (Antioch) is a non-profit educational institution located in Minneapolis that awards bachelor of arts and master of arts degrees. Antioch is an affiliate of Antioch College of Yellow Springs, Ohio. Respondent Pyle and his firm are counsel for Antioch and he is a faculty member there. Respondent Pyle's wife, Gwen Jones Pyle, is president of Antioch and also chairs the Law and Justice Department at the school.

Candace Brown was a student of respondent Pyle and was later represented by him in a Dalkon Shield case. Ms. Brown was majoring in law and justice and was involved in an academic research project concerning Dalkon Shield litigation. Respondent Pyle provided Ms. Brown with various publications on the history of the Dalkon Shield. Ms. Brown occasionally met with Mr. Pyle to discuss the project, but Ms. Brown's direct faculty advisor was Mr. Sumner Jones.

In September 1977, Mr. Jones placed an ad in a small newspaper which indicated that two researchers would pay $10 for each interview with women who had used a Dalkon Shield. Ms. Brown was not involved in the placement of the ad but did become involved in the interviews that resulted. Respondent Pyle was aware that Ms. Brown was recommending to persons who responded to the ad that they contact respondents' firm and did not discourage such recommendations. Respondent Pyle indicated to Ms. Brown that such referrals were permissible.

In the summer of 1977, Lisa Boelke responded to a similar advertisement placed by Mr. Jones and was telephoned by Ms. Brown. At a lunch meeting, Ms. Brown told Ms. Boelke that she was suing for her own injuries from the Dalkon Shield and asked whether Ms. Boelke would be adverse to having Ms. Brown's attorney call her. Ms. Boelke replied that "it was too sudden," and that she wasn't thinking of doing anything at that point. Ms. Brown gave Ms. Boelke a note with respondent Pyle's name and phone number. After the lunch meeting, Ms. Boelke did not take any steps to contact respondent Pyle. Ms. Brown, however, left respondent Pyle with the message that he should contact Ms. Boelke. Respondent Pyle phoned several times and left messages for Ms. Boelke but she never returned those calls. Respondent Pyle phoned several days later, but Ms. Boelke again did not return the call. Through an independent referral by her own attorney, Ms. Boelke did eventually retain respondents' firm.

There is no evidence that respondents paid any money to Candace Brown or Mr. Jones for referral of Dalkon Shield cases to them, but they did provide some material and consultation in connection with the research project.

The facts as found by the referee present two separate circumstances that the Board contends constitute violations of the disciplinary rules by respondents. The first set of alleged violations arises from respondents' distribution of the written materials in the form of the brochure and the letter. (DR 2–101(A), 2–103(A), (C), (D), (E), (F) (1977).)[2] The second set of alleged violations arise from respondents' solicitation of Dalkon Shield cases through respondents' relationship with Candace Brown and Sumner Jones. (DR 2–103(A), (C), (D), (E) (1977).)[3]

---

**2.** These disciplinary rules have since been amended specifically to exclude discipline for distribution of any form of written communication except when such communication contains false, fraudulent, misleading, or deceptive statements or claims. DR 2-101(A), 2–103(A) (1980).

**3.** *See* note 2 *supra.*

## I. *Respondents' Distribution of Written Materials.*

■ Respondents do not seriously contest the determination that a technical violation of the disciplinary rules prohibiting advertising did occur. Their contention rather is that the disciplinary rules in force at the time of the distribution of the letter and brochure were an unconstitutional restriction on respondents' first amendment right to free speech.

A challenge to the constitutionality of state restrictions on lawyer advertising has been addressed by the United States Supreme Court. In *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), two attorneys who were operating a legal clinic prepared and had published an advertisement designed to attract clients to the clinic. The advertisement stated that the attorneys would provide "legal services at very reasonable rates." The services for which fees were listed were routine and did not contemplate contested or prolonged proceedings. The Arizona State Bar contended that such advertising violated Disciplinary Rule 2–101(B) of the ABA's Code of Professional Responsibility, which had been adopted by the State of Arizona.[4] The attorneys contended that the disciplinary rule was violative of the Sherman Act and the first amendment.[5]

In finding that the disciplinary rule as applied was an unconstitutional restriction on first amendment rights, the Court emphasized that the public's interest in the free flow of commercial information is significant. The opinion states in part:

> The listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue. Moreover, significant societal interests are served by such speech. Advertising, though entirely commercial, may often carry information of import to significant issues of the day. And commercial speech serves to inform the public of the availability, nature and prices of products and services and thus performs an indispensable role in the allocation of resources in a free enterprise system. In short, such speech serves individual and societal interests in assuring informed and reliable decisionmaking.

433 U.S. at 364, 97 S.Ct. at 2699 (citations omitted).

The Court then determined that any restriction on the public's right to such information was violative of the first amendment absent compelling governmental justifications for such restriction. The *Bates* Court separately addressed each of the state bar's justifications for prohibiting advertising and determined that there is no connection between advertising and the erosion of professionalism; that lawyer advertising is not inherently misleading; that advertising would not adversely affect the administration of justice; that advertising would not have undesirable economic effects; that advertising would not adversely affect the quality of legal services; and that advertising would not be difficult to supervise. *Id.* at 368–76, 378–79, 97 S.Ct. at 2701–2705, 2706. In addition, the Supreme Court reaffirmed in *Bates* its earlier holding in *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), that advertising by professionals could still be subject to time, place, or manner regulation and that false, deceptive, or misleading information was not protected speech.

The *Bates* decision was a narrow one in that the Court only addressed the question of whether price advertising for routine legal services was protected under the first amendment. The written materials distributed by respondents in this case did not deal with price advertising but rather with cases that could be handled on a contingent fee

---

4. The disciplinary rule applicable in *Bates* is substantially identical to Minnesota Disciplinary Rule 2–101(B) in force at the time of the distribution of the letter and brochure in this case.

5. The Sherman Act claim was determined to be without merit because of state involvement.

basis. Similarly, the business sought by respondents involved complex and specialized products liability litigation, not routine legal services. The question before this court is whether, in light of these distinctions, first amendment protection should be extended to respondents' distribution of the letter and brochure.

Our application to this case of the *Bates* analysis that considers the state interests being served by the disciplinary rules prohibiting advertising and the combined interests of respondents' right to free speech and the public's right to receive commercial information requires that we conclude respondents' conduct in distributing the written materials was constitutionally protected. The Board has not suggested any justifications for restricting respondents' distribution of the written materials. It must be assumed that the state interests that motivated the adoption of the disciplinary rules involved are similar to those addressed and specifically rejected by the *Bates* Court. More specific government interests are suggested by the facts, however.

It could be argued, for example, that advertising directed towards attracting complex litigation cases such as involved here has a greater potential for abuse by lawyers not qualified to pursue such litigation. A careful consideration of this justification reveals that it is not sufficient to tip the balance of interests in the Board's favor. Even if it can be assumed that there is a greater potential for abuse when complex cases are solicited, there are alternative forms of regulation that can be imposed that would be less restrictive of the attorney's right to advertise and the public's right to receive commercial information. That alternative is to require lawyers who advertise for cases requiring some specialization to be certified in that particular area of specialization. The ABA has already drafted disciplinary rules that contemplate a certification process.[6] Additionally, there is an existing and enforceable disciplinary

rule in Minnesota that prohibits counsel from accepting employment when he or she is not qualified or competent to handle the matter. DR 6–101(A)(1) (1980). This suggested justification for restricting the type of advertising engaged in by respondents is therefore not sufficiently compelling in light of the first amendment rights of respondents and the public.[7]

A further justification may be asserted by the Board as particularly appropriate. At least one court has determined that the distribution of handbills, circulars or other forms of nontraditional media advertising should be restricted because of the "insurmountable problems in enforcement." *In re Rule of Court*, 564 S.W.2d 638 (Tenn. 1978). Because the brochure and letter distributed by respondents both have characteristics similar to a "circular," the argument can be made that the difficulty of enforcement is a compelling justification for the prohibition against the distribution of the brochure. The difficulty of enforcement argument was found to be without merit in *Kentucky Bar Association v. Stuart*, 568 S.W.2d 933 (Ky.1978). In that case, the bar association sought to discipline attorneys who sent letters to real estate agencies advising that the law firm handled all aspects of real estate transactions and noting fees for particular services. In finding that enforceability was not a compelling state interest, the court determined that the enforcement of ethical standards would not be overly difficult if advertising is in the form of a letter and that the public can be assured of protection by the promulgation of a rule that requires screening of written material by the state authority. Such a procedure has been found to be a constitutional "manner" restriction in Alabama. *See Foley v. Alabama State Bar*, 481 F.Supp. 1308 (N.D.Ala.1979). It should also be noted that the Court in *Bates* expressly addressed the enforcement justification as follows:

> It is at least somewhat incongruous for the opponents of advertising to extol the

---

6. ABA DR 2–105(A) (1978).

7. The Board does not contend that the quality of service rendered to clients referred by the advertising was deficient in any respect.

virtues and altruism of the legal profession at one point, and, at another, to assert that its members will seize the opportunity to mislead and distort. We suspect that, with advertising, most lawyers will behave as they always have: They will abide by their solemn oaths to uphold the integrity and honor of their profession and of the legal system. For every attorney who overreaches through advertising, there will be thousands of others who will be candid and honest and straightforward. And, of course, it will be in the latter's interest, as in other cases of misconduct at the bar, to assist in weeding out those few who abuse their trust.

433 U.S. at 379, 97 S.Ct. at 2706.

This analysis is equally applicable here.

The fact that respondents' materials referred to a contingent fee arrangement rather than a stated fee such as that present in *Bates* cannot be viewed as significant. The availability of a contingent fee arrangement is an important consideration for any potential client who may be considering the initiation of a lawsuit. A contingent fee arrangement may be the only method by which a party would be able to finance litigation. The Board has not suggested and we are not otherwise aware of any state interests that would be served by restricting advertising containing contingent fee information. In the absence of a justification for restricting contingent fee information, we must conclude that publishing such information is constitutionally protected.

In contrast to the lack of compelling state justifications for restricting advertising, the facts in this case demonstrate that important individual and public interests are present. The information supplied through respondents' distribution of the letter and brochure made several injured parties aware of their legal position and absent access to the letter and brochure, some of those individuals would not have been made aware of their rights. The manufacturer, against whom the solicited litigation was directed, apparently engaged in particularly egregious conduct which resulted in severe and permanent injuries to a substantial number of people.

The absence of compelling state interests to justify a restriction on written advertising and the presence of significant public and individual first amendment interests requires that we conclude that prohibiting such conduct, as set forth in the former DR 2-101 (1977) (amended 1980) was unconstitutional.

The Board also asserts that the respondents' distribution of the letter and brochure constituted impermissible *solicitation* of legal business and therefore was not within the purview of the *Bates* holding.

As the discussion above clearly indicates, *Bates* requires that the state's interests in restricting lawyer advertising must be compelling in light of the individual and societal interests in the free dissemination of commercial information. The Supreme Court's treatment of solicitation by lawyers is similar.

*In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), is a decision that arose from a disciplinary authority's proceeding against an American Civil Liberties Union lawyer. The attorney involved had sent a letter to a woman with whom the attorney had discussed the possibility of seeking redress for an alleged unconstitutional sterilization. The state contended that the letter constituted impermissible solicitation. The Court determined that the ACLU was an organization committed to furthering civil liberties through litigation and that because such litigation was "a form of political expression," the activities of the lawyer on behalf of the ACLU were entitled to the first amendment protection "reserved for associational freedoms." The Court reasserted its position taken in *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), that regulation of protected first amendment expression is inherently suspect and that such regulation must be narrowly drawn to avoid unnecessary restriction of one of "our most precious freedoms." 436 U.S. at 432, 98 S.Ct. at 1905. The Court further deter-

mined that the state's interest in protection against "undue influence, overreaching, misrepresentation, invasion of privacy, conflict of interest, lay interference and other evils" was not served by the prohibition of the kind of activity engaged in by the lawyer against whom the disciplinary proceeding was directed. *Id.* at 432–39, 98 S.Ct. at 1904–1908. Because the state could not demonstrate a compelling justification for the restriction, the Court found the disciplinary rules unconstitutional as applied to the ACLU attorney.

■ The interests that must be considered when a restriction on solicitation is involved are the individual's first amendment right to associate freely and the state's interests in preventing overreaching, invasion of privacy, undue influence and the like. The *Primus* Court implicitly recognized that solicitation involved greater potential for abuse than did advertising because solicitation, by its nature, could not be as easily ignored as an advertisement, would not compete with legitimate commercial expression in the public marketplace of ideas, and would not be susceptible to effective enforcement of guidelines issued by the state. The state's justifications are therefore far more compelling when solicitation is involved.[8]

The *Primus* Court did not, however, question whether the letter involved in that case constituted solicitation or advertising. There, the letter involved was a single mailing to a particular individual who was known to have been wronged and suggested very specific litigation. Such a mailing possessed many of the attributes of solicitation, but the Court nevertheless determined that the letter was entitled to first amendment protection. The clear reason for this result was that the government could not demonstrate that restricting such mailings by the ACLU served any significant state interests. The character of the mailing, be it solicitation or advertising, should not be treated as significant. Rather, the poten-

tial for abuse and the strength of the state's interest in preventing that abuse must be viewed as determinative.

In the case of *Koffler v. Joint Bar Association*, 51 N.Y.2d 140, 412 N.E.2d 927, 432 N.Y.S.2d 872 (1980), the New York Court of Appeals determined that mass mailings to real estate owners and brokers by two attorneys were constitutionally protected. The court reasoned that the distinction between advertising and solicitation was an "artificial" one that cannot be used to determine the constitutionality of a restriction on commercial expression. The court adopted the approach taken by the United States Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). This analysis required a four-part inquiry before a restriction could be determined to be an unconstitutional abridgment of first amendment rights: "(1) Is it misleading or related to unlawful activity? (2) Are the government interests sought to be protected substantial? (3) How directly does the regulation advance those interests? (4) Is there a less restrictive alternative?" 412 N.E.2d at 931, 432 N.Y.S.2d at 876. The *Koffler* court applied this analysis and determined that nothing in the letters was misleading or related to unlawful activity. The court recognized the importance of the state's interest in protecting against overcommercialization of the profession, preventing invasions of privacy, and controlling the potential for deception. The court concluded, however, that restricting mailings either did not serve those interests or that such interests could be adequately and less restrictively served by existing or easily implemented bar rules. *See also Kentucky Bar Association v. Stuart*, 568 S.W.2d 933 (Ky.1978); *In re Madsen*, 68 Ill.2d 472, 12 Ill.Dec. 576, 370 N.E.2d 199 (1977).

We find the *Koffler* court's approach to this issue persuasive. Respondents' materials did not contain any misleading informa-

---

**8.** *See* discussion of *Ohralik v. Ohio State Bar*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444

(1978) at II below.

tion, nor were they related to any unlawful activity. The state's interests in protecting the public from deceptive or overbearing tactics employed by attorneys are not served by restricting the distribution of written materials. Recipients of respondents' materials could have as easily discarded them if they were not interested as they could have ignored a billboard or newspaper advertisement. In addition, the written documents also provide a record of what was stated as a protection against abusive conduct.[9]

The characterization of respondents' letters and brochures as advertisements or solicitation serves no useful purpose. The analysis to be made in either case is essentially the same. The attorney's right to speak and associate freely and the public's right to receive commercial information must be considered as well as the state's interest in regulating the profession in order to protect the public from abuses by lawyers. The balance is a delicate one and the lines are not easily drawn. In this case, the individual and societal interests are substantial and the state's interests, alone or in combination, are not sufficiently compelling to justify a restriction of those first amendment rights. The state's interests are not compelling in this case because an alternative regulation that requires submission and review of written materials is less restrictive of the first amendment rights involved.

We hold therefore that the former disciplinary rules [10] are unconstitutional restrictions of respondents' first amendment rights to the extent they prescribe discipline

for distribution of the written materials involved.

## II. *Respondents' Acceptance of Referrals.*

■ The Board contends that the respondents' relationship with Candace Brown and the referrals made to them as a result of that relationship warrant discipline under the former disciplinary rule relating to in-person solicitation. DR 2–103(A), (C), (D), (E) (1977).[11] The respondents' position is that they did not violate the provisions of the rule and that if a technical violation did occur, their activity was constitutionally protected.

The decision in *Ohralik v. Ohio State Bar,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), set forth the standards to be applied in assessing whether in-person contacts by a lawyer are entitled to constitutional protection. The attorney involved in *Ohralik* had visited an accident victim in the hospital and had her sign a retainer agreement. The attorney also visited another accident victim and tape recorded the conversation in which she assented to retaining him. Both of these injured young women later discharged the attorney, but he succeeded in obtaining a portion of the insurance settlement after he initiated suit for breach of contract against one of the women. In deciding the conduct warranted discipline, the Court noted that the potential for abuse by attorneys engaged in personal solicitation was far greater than the potential for harm that exists with advertising. The state's interest in preventing such abuses was also seen as more compelling when

---

**9.** The *Primus* Court also recognized that written communication is more easily policed than other types of communication. *See* 436 U.S. at 435 36, 98 S.Ct. at 1906–1907.

**10.** DR 2–101, 2–103 (1977) (amended 1980).

**11.** The cited provisions of the rule in effect at the time of respondents' activities provided as follows:

DR 2–103. **Recommendation of Professional Employment**

(A) A lawyer shall not recommend employment, as a private practitioner, of himself or anyone associated with him to a non-lawyer

who has not sought his advice regarding employment of a lawyer.

. . . .

(C) A lawyer shall not request any person to recommend employment, as a private practitioner, of himself or anyone associated with him.

(D) A lawyer shall not knowingly assist any person to promote the use of his services or those of any lawyer associated with him.

(E) A lawyer shall not accept employment when he knows or it is obvious that the person who seeks his services does so as a result of conduct prohibited under this Disciplinary Rule.

personal contact was made. The Court even suggested that the societal interests identified in *Bates* may actually be disserved by solicitation tactics that prevent informed and reliable decision-making by the public.

As in *Primus*, the Court recognized that the appropriate focus was whether the attorney's activities presented the same dangers the ban on solicitation sought to prevent and therefore whether the state's interests were indeed served by restricting such conduct. The Court indicated that this analysis did not require proof of whether the conduct was in fact abusive in some manner, but rather that the question was whether the conduct involved the potential for such abuse.

One court has carefully applied the *Ohralik* analysis to a case that involved an attorney who solicited victims of a large train accident. In *In re Teichner*, 75 Ill.2d 88, 25 Ill.Dec. 609, 387 N.E.2d 265 (1979), a train derailment and resulting explosion caused extensive and severe damage to citizens and residences of Laurel, Mississippi. Many of the injured parties were poor. The attorney involved was contacted through the efforts of the Reverend Allen Johnson, a pastor of a local church and community leader who had established a relief effort. The Reverend arranged for the attorney to visit Laurel and contact the victims of the accident. Rev. Johnson believed that the representatives of the railroad were negotiating inadequate settlement agreements with injured persons and that advice of legal counsel was necessary. The attorney had repeatedly contacted the son of two hospitalized victims of the accident and requested permission to contact his parents in the hospital.[12]

The court determined that such activity constituted solicitation but found that the contacts made were entitled to first amendment protection. The court reasoned as follows:

> In the instant case, we are faced with an attorney whose activities are tinged with the sort of associational values strongly protected by the first and fourteenth amendments, yet whose intent to benefit financially also is unmistakable. If we were to base our judgment solely upon what we believe to be the prevailing motive of the respondent, we would have to conclude that his motive was pecuniary, not ideological. Yet our analysis cannot stop there, for as Mr. Justice Marshall aptly pointed out in his separate opinion, activity and expression which fall within the core of protected first amendment values do not automatically lose their protection because the actor or speaker stands to benefit financially from his actions. It is the flow of information and the effective association of individuals which are protected.

25 Ill.Dec. 609, 387 N.E.2d at 271 (citations omitted).

The kind of associational interests present in *Teichner* can also be recognized in respondents' activities. Respondents do not contest that one of their motivations for distributing written materials and accepting referrals was monetary. Respondents argue, however, that their contacts with prospective clients, like the contacts involved in *Teichner*, also served a significant public interest. That interest is to inform injured parties of their rights and the availability of legal services that allow them to enforce those rights.

The injuries sustained by women using the Dalkon Shield were sometimes severe and disabling. Like the overreaching by railroad adjusters in *Teichner*, the Robins Company evidenced a disregard for the health and safety of women using the Dalkon Shield by continuing to market the product after serious defects were discovered. The litigation that resulted from respondents' contacts further publicized the injuries suffered and the dangers associated with the use of the Dalkon Shield.

The state's interests in prohibiting overreaching, harassment and other abuses by

---

**12.** Other grounds for discipline were also asserted and found to be meritorious. The attorney was suspended from practice for two years.

attorneys who engage others to solicit legal business are also obvious. We need not, however, address the issue of whether the state's interests are sufficiently compelling in light of the substantial public interest involved. Rather, we have determined that the facts do not justify a finding that respondents violated the applicable disciplinary rule through their relationship with the Antioch project or the acceptance of referrals from Ms. Brown.

In support of its contention that respondents intentionally established a referral system, the Board has stressed (1) respondent Pyle's relationship to the school, (2) respondents' assistance in providing materials and suggestions to the researchers, (3) respondents' acceptance of referrals made by Ms. Brown, and (4) respondent Pyle's attempt to contact Ms. Boelke. A careful review of each of these factors demonstrates that there is no evidence of a concerted effort on the part of respondents to obtain clients through Ms. Brown or Mr. Jones.

Respondent Pyle does in fact have a close involvement with Antioch College. He was an instructor there and his wife holds several important and influential positions at the school. There is no evidence in the record, however, to indicate that respondent Pyle or Mrs. Pyle ever used or threatened to use influence to instigate or control a research project designed to benefit respondents' law firm. Ms. Brown had been injured by a Dalkon Shield so she had a legitimate and personal interest in doing a project that would help her better understand her own experience, inform other women in similar circumstances of possible injuries, publicize the irresponsible activities of the manufacturer, and fulfill an academic requirement.

Respondents did provide the researchers, specifically Ms. Brown, with certain information they had compiled on the Dalkon Shield. There is no suggestion that providing the information was conditioned on or given as compensation for referral of cases to the firm. The referee specifically found that there was no evidence respondents paid any money to Ms. Brown or Mr. Jones

for the referrals made by them. The Board cites *In re Carroll*, 124 Ariz. 80, 602 P.2d 461 (1979), in which the court held that activities of third parties in personally recruiting clients were ratified by the attorneys because of continued acceptance of such referrals. That case can be distinguished because one of the referring parties in *Carroll* was an investigator hoping to gain employment with the attorneys and the other referring party received special credit treatment and cash through the attorneys involved.

No exchange of value took place in this case. The research information and advice given by respondents to Ms. Brown was wholly gratuitous. Additionally, it was only natural for Ms. Brown to look to respondents for background material. They had represented her in her own suit against Robins, respondent Pyle had been one of her instructors, and she was aware that they had a certain expertise in the matter.

Ms. Brown undoubtedly referred cases to respondents because she knew them, because they had handled her case competently and because she did not want the people she had interviewed to remain injured and uncompensated. Because of her own limited knowledge of attorneys who could handle such involved litigation work, it is not likely that Ms. Brown could have confidently made a referral to anyone other than respondents. The facts indicate that Respondent Pyle informed Ms. Brown that such referrals were permissible. There is no suggestion, however, that either of respondents requested that such referrals be made. In sum, the conclusion that the referrals made were made through Ms. Brown as an agent for respondents is not warranted by the facts.

■ Finally, the Board argues that respondent Pyle's attempts to contact Lisa Boelke violated DR 2–103(A), (C), (D), (E) (1977). The facts as found by the referee show that respondent Pyle only attempted to contact Lisa Boelke after he had received a message to do so. Respondent Pyle contends that he assumed that Ms. Boelke had requested that he call her. Such an as-

sumption is reasonable and is not refuted in the record.

Since the facts are not sufficient to indicate respondents violated the applicable disciplinary rules in dealing with the Antioch project or in accepting referrals from Ms. Brown, the petition for discipline must be dismissed.

We also note, parenthetically, that Judge Rolloff concluded that the distributed materials were "self-laudatory" and in violation of DR 2–101 (1977). While we do not believe that the first brochure necessarily violated DR 2–101, it appears that the second brochure, which referred to respondents' ability to settle Dalkon Shield cases out of court, did. This violation was not of such serious proportions, however, as to warrant more than an admonition.

Despite our holding in this case that respondents cannot be disciplined for their conduct, we think it important to emphasize that this decision should not be read to permit indiscriminate solicitation by attorneys of this state nor are the attorneys involved entitled to accolades for their conduct. We believe it would have been preferable for them to have contacted the Board and sought an opinion from it after the *Bates* case and to have proceeded in an attempt to get the rules changed before acting on their own. While we are determined to comply with both the spirit and the letter of the United States Constitution as delineated by the United States Supreme Court in *Bates, Primus* and *Ohralik*, we are equally determined to do what we can to prevent and discourage abuses that may occur.

We view the right of the general public to know of the availability of professional services as the principal interest involved in advertising for such services. Advertisements designed to achieve less important objectives will be subject to a more critical scrutiny. Overbearing and intrusive practices such as personal solicitation, direct or indirect, and the giving of value in exchange for a favorable commendation or reference are not permitted. We insist on affirmative adherence to the principle that false, misleading or deceptive statements constitute a serious violation of professional ethics and will require severe sanction. Conduct that the advertising attorney knows or should know is an interference with an existing professional relationship is prohibited. Claims of special expertise in advertisements may be found to be material representations giving rise to a warranty of competence or information that is false, deceptive or misleading.

The Petition for Discipline is dismissed.